IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DERRICK GADSDEN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. |
| v. | ) | 2:17cv58-WKW-JTA |
| | ) | (WO) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the court is Petitioner Derrick Gadsden's ("Gadsden") *pro se* motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence by a person in federal custody. Doc. 1.[1]

## I.   INTRODUCTION

On April 22, 2014, Gadsden pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349.  Doc. 4-7.  Gadsden and his brother, David, were the leaders of a large-scale conspiracy that involved opening or causing others to open bank accounts with minimum deposits and using bad checks from those accounts to buy merchandise from various businesses.  *See* Doc. 8-1 at 4–5, ¶ 6.  The brothers would then resell the merchandise for a profit.  *Id*. at 5, ¶ 6.  Law enforcement agents identified nearly

---

[1] References to "Doc(s)." are to the document numbers of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the Clerk of Court. Unless otherwise noted, pinpoint citations are to the page of the electronically filed document in the court's CM/ECF filing system which may not correspond to pagination on the "hard copy" of the document presented for filing.

200 members of the conspiracy. *Id.* Following a sentencing hearing on November 6, 2014, the district court sentenced Gadsden to 240 months in prison. Doc. 4-16.

Gadsden appealed, arguing that (1) the district court's loss-amount calculation was not supported by sufficient evidence; (2) the district court improperly counted victims and losses from time during the conspiracy when Gadsden was incarcerated on other charges; (3) the district court erred in finding he was a leader or organizer of the conspiracy; and (4) the district court erred in imposing a sophisticated-means enhancement to his sentence. *See* Doc. 4-18.

On March 4, 2016, the Eleventh Circuit rejected Gadsden's claims and affirmed his conviction and sentence in an unpublished opinion. *United States v. Gadsden*, 644 F. App'x 987 (11th Cir. 2016); Doc. 4-19. Gadsden did not seek certiorari review in the United States Supreme Court.

On December 16, 2016, Gadsden filed this § 2255 motion asserting the following claims:

1. His trial counsel rendered ineffective assistance in the following ways:

   a. The relationship between him and counsel was so irreconcilably broken that it affected the integrity of the proceedings.

   b. Counsel failed to advise him of the effects the plea agreement would have on his sentencing.

   c. Counsel agreed at the sentencing hearing with the lawyer for Gadsden's codefendant brother, David, that the loss amount attributable to Gadsden and his brother was between $800,000 and $1 million.

  d. Counsel failed to object to the number of victims attributed to him at sentencing.

  e. Counsel failed to argue that the number of victims should be reduced by the same percentage by which the district court reduced the loss amount attributed to him.

  f. Counsel failed to object to the Government's use of his proffer statements at sentencing.

  g. Counsel failed to argue he was entitled to a reduction for acceptance of responsibility.

  h. Counsel failed to challenge the Probation Office's calculation of his criminal history points.

2. The district court erred by imposing a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.

3. The district court erred in its calculation of the restitution to which he was responsible.

4. His conviction should be vacated "for lack of jurisdiction" because some of the checks in the case were not processed electronically or transmitted through interstate wire.

Doc. 1 at 4–8; Doc. 1-1 at 7–56.

  The Government filed a response on March 6, 2017, arguing that Gadsden's ineffective assistance of counsel claims are without merit and that his remaining claims are procedurally barred and lacking in merit. Doc. 4. By a motion filed on April 1, 2019, Gadsden supplemented his § 2255 motion with matters purportedly supporting his claims regarding the number of victims and the district court's lack of jurisdiction. Doc. 18. By a motion filed on January 20, 2020, he supplemented his § 2255 motion with matters

purportedly supporting his claim regarding the district court's restitution calculation. Doc. 19.

After considering the parties' submissions, the record, and the applicable law, the court finds that Gadsden's § 2255 motion should be denied without an evidentiary hearing. Rule 8(a), *Rules Governing Section 2255 Proceedings in the United States District Courts*.

## II.   DISCUSSION

### A.   General Standard of Review

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments under 28 U.S.C. § 2255 are limited. A prisoner may have relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255; *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999). "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).

### B.   Ineffective Assistance of Counsel Claims

A claim of ineffective assistance of counsel is evaluated against the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at

4

689.  Second, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  *See Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000).

Scrutiny of counsel's performance is "highly deferential," and the court indulges a "strong presumption" that counsel's performance was reasonable.  *Chandler*, 218 F.3d at 1314 (internal quotation marks omitted).  The court will "avoid second-guessing counsel's performance:  It does not follow that any counsel who takes an approach [the court] would not have chosen is guilty of rendering ineffective assistance."  *Id*.  (internal quotation marks and brackets omitted).  "Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one."  *Id*.

As noted, under the prejudice component of *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.  The prejudice prong does not focus only on the outcome; rather, to establish prejudice, the petitioner must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.  *See Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) ("[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.").  "Unreliability or unfairness does not result if the ineffectiveness of counsel does not

5

deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* at 372.

Unless a petitioner satisfies the showings required on both prongs of the *Strickland* inquiry, relief should be denied. *Strickland*, 466 U.S. at 687. Once a court decides that one of the requisite showings has not been made, it need not decide whether the other one has been. *Id.* at 697; *Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998).

A criminal defendant's right to effective assistance of counsel continues through direct appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Ineffective assistance of appellate counsel may be shown if the movant can "establish . . . that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker[.] Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

### 1.    *Breakdown in Relationship with Counsel*

Gadsden claims his relationship with his trial counsel, Richard K. Keith, was so irreconcilably broken that it affected the integrity of the proceedings. Doc. 1 at 4; Doc. 1-1 at 7–16. According to Gadsden, his relationship with Keith was "clouded by an atmosphere of mistrust, misgivings, and irreconcilable differences resulting from claims of conflicted interests," which he says caused Keith to render him ineffective assistance of counsel. Doc. 1-1 at 8.

In support of this claim, Gadsden cites various actions by Keith that he considers to be unsatisfactory. However, none of the matters cited by Gadsden indicate irreconcilable

differences with Keith, and nothing Gadsden points to establishes deficient performance by Keith or resulting prejudice.  For instance, Gadsden complains that following a May 30, 2014 meeting between Keith and Government lawyers, Keith failed to "timely notify" him that he had agreed to stipulate to a 12-level loss amount enhancement under U.S.S.G. § 2B1.1(G).  Doc. 1-1 at 8–9.  However, the record reflects that no later than June 2, 2014 (three days after Keith's meeting with Government lawyers and several months before Gadsden's sentencing hearing), Keith informed Gadsden of the proposed stipulation, was told by Gadsden that he did not agree to the stipulation, and notified the Government that Gadsden did not agree to the stipulation.  *See* Doc. 4-20 at 3–5.  Moreover, the stipulation depended upon the district court's acceptance of the plea agreement—which, in the end, was rejected by the district court.  Gadsden fails to show how Keith's performance here was deficient or how he was prejudiced by Keith's performance.

Gadsden also claims the breakdown in his relationship with Keith was so serious that he filed a *pro se* motion to withdraw his guilty plea on June 4, 2014.  *See* Doc. 1-1 at 9.  In that motion, Gadsden maintained Keith was pressuring him to admit his participation in parts of the conspiracy he was not involved in.  Three weeks after filing the motion to withdraw his guilty plea, however, Gadsden moved to dismiss the motion, stating as grounds that he understood Keith intended to argue at sentencing that Gadsden was not involved in certain parts of the conspiracy.[2]  Gadsden fails to show that Keith's performance was deficient or that he was prejudiced by that performance.

---

[2] *See* Docs. 89, 94, and 96 in Gadsden's criminal case, Case No. 2:13cr159-WKW.

In similar fashion, Gadsden changed his mind about a *pro se* motion to dismiss Keith as his counsel that he filed on August 1, 2014. Four days after moving to dismiss Keith as his counsel, Gadsden withdrew the motion to dismiss Keith, stating that he had since determined Keith was not responsible for his not receiving a substantial assistance departure, which had been his stated basis for moving to dismiss Keith as his counsel.[3] Here, again, Gadsden fails to show how Keith's performance was deficient or that he was prejudiced by Keith's performance.

The record also shows that on April 15, 2014, one week before he entered his guilty plea, Gadsden filed a *pro se* motion to have Keith withdraw as his counsel and to have new counsel appointed.[4] A hearing was held on that motion on April 17, 2014, after which the magistrate judge denied the motion. Doc. 9-1. Gadsden points to nothing in that motion or the hearing on that motion that supports his claim that there was a breakdown in his relationship with Keith that resulted in Keith's rendering him ineffective assistance of counsel.

Although a criminal defendant has a right to be represented by counsel, he does not have a right to be represented by a particular lawyer, or to demand a different lawyer except for good cause. *See United States v. Sexton*, 473 F.2d 512, 514 (5th Cir. 1973). Good cause cannot be determined "solely according to the subjective standard of what the defendant perceives." *McKee v. Harris*, 649 F.2d 927, 932 (2d Cir. 1981). A defendant's

---

[3] *See* Docs. 103, 107, and 108 in Case No. 2:13cr159-WKW.

[4] *See* Doc. 69 in Case No. 2:13cr159-WKW.

justifiable dissatisfaction with counsel includes an irreconcilable conflict or a complete breakdown in communication. *Hunter v. Delo*, 62 F.3d 271, 274 (8th Cir. 1995). But it does not include a defendant's frustration with counsel who does not share defendant's tactical opinions but continues to provide zealous representation. *United States v. Swinney*, 970 F.2d 494, 499 (8th Cir. 1992). A defendant has no right to an attorney who will docilely do as he is told, *Hunter,* 62 F.3d at 275, or to a "meaningful relationship" with appointed counsel, *Swinney*, 970 F.2d at 499.

Gadsden's conclusory allegations do not demonstrate a breakdown in his relationship with Keith that affected the integrity of the proceedings. Gadsden fails to establish either deficient performance by Keith or resulting prejudice. Therefore, he is entitled to no relief on this claim of ineffective assistance of counsel

### 2.      *Failure to Advise About Effects of Plea Agreement*

Gadsden claims Keith rendered ineffective assistance of counsel by failing to advise him of the effects the plea agreement would have on his sentencing. Doc. 1 at 4; Doc. 1-1 at 17–21. Gadsden points specifically to Keith's failure to timely notify him that he had agreed with Government lawyers at a May 30, 2014 meeting to stipulate to a 12-level loss enhancement for Gadsden (*see* Part II.B.1, above). Doc. 1-1 at 18–19.

As discussed above, within three days of Keith's May 30 meeting with Government lawyers, Keith had informed Gadsden of the proposed stipulation and then notified the Government that Gadsden disagreed with the stipulation. Moreover, on August 7, 2014, the district court notified Gadsden on the record that it was rejecting the plea agreement reached by the parties because the court could not, in compliance with the Sentencing

Guidelines, be bound by the loss amount agreed to by the parties.[5]  Doc. 4-11 at 6–7.  The court then gave Gadsden the option to proceed without a plea agreement or to withdraw his plea and proceed to trial.  Doc. 4-11 at 6–7.  The court informed Gadsden that if he did not withdraw his guilty plea, the court might dispose of his case less favorably than contemplated under the plea agreement.  *Id.* at 7.  On August 25, 2014, Gadsden gave the court notice of his intent to proceed without a plea agreement.  Doc. 4-12.

Because Gadsden proceeded without a plea agreement, he could not have been prejudiced by Keith's alleged failure to timely notify him that the plea agreement included a stipulation to a 12-level loss enhancement.[6]  It is clear, moreover, that when Gadsden decided to proceed without the plea agreement, he was aware of the loss-amount stipulation and was aware that if he did not withdraw his guilty plea, the district court might dispose of his case less favorably than contemplated under the plea agreement. Gadsden fails to

---

[5] The plea agreement that was rejected by the district court called for a loss amount of $200,000 to $400,000, for a 12-level enhancement under U.S.S.G. § 2B1.1(G).  *See* Doc. 3 at 2.  In addition, the plea agreement provided:

> The parties also agree that if the calculations for the intended and actual loss amounts turn out to be higher that the original amounts stated in the plea agreement, the Government will honor the original amounts stated in the plea agreement.  If the intended and actual loss amounts turn out to be lower than the original amounts stated in the plea agreement, the Government will honor the lower amount.

Doc. 4-6 at 4.

[6] Under the rejected plea agreement, it was possible that the loss amount enhancement could be less than 12 levels if the calculated loss amounts turned out to be lower than the amounts stated in the plea agreement.  *See* Doc. 4-6 at 4.

establish deficient performance by Keith or any resulting prejudice.   Therefore, he is entitled to no relief on this claim of ineffective assistance of counsel.

###    3.    *Argument Regarding Loss Amount*

Gadsden argues that Keith was ineffective for agreeing at the sentencing hearing with the lawyer for his codefendant brother, David, that the loss amount attributable to Gadsden and his brother was between $800,000 and $1 million when the parties had earlier stipulated in the (rejected) plea agreement that the loss amount was $400,000.  *See* Doc. 1 at 4; Doc. 1-1 at 22–28.

Under § 2B1.1(b)(1) of the Sentencing Guidelines, the offense level for a defendant convicted of certain economic offenses—including offenses involving fraud and deceit— is subject to a specific offense characteristic enhancement if the loss from the criminal conduct exceeded $5,000, with the extent of the enhancement determined by the amount of the loss.  U.S.S.G. § 2B1.1(b)(1) (2013).[7]  In determining Gadsden's offense level, the district court imposed a 14-level enhancement under § 2B1.1(b)(1) based on a loss calculation of $1,000,000.  *See* U.S.S.G. § 2B1.1(b)(1)(H–I) (2013) (providing for 14-level enhancement where loss is more than $400,000 but less than $1,000,000).  Doc. 4-16 at 105.

---

[7] The 2013 Guidelines Manual was used in calculating Gadsden's offense level.  *See* Doc. 8-1 at 12, ¶ 22.  The 2015 Guidelines Manual (effective November 1, 2015) increased the minimum loss amount for application of the § 2B1.1(b)(1) enhancement to $6,500 and increased the various amounts of loss required to trigger various increases in the offense level enhancements under § 2B1.1(b)(1).

Gadsden and his codefendant brother, David, were sentenced jointly at the November 6, 2014 sentencing hearing.  At that hearing, David's counsel, Laronda Renee Martin, objected to the Government's proposed loss-amount figure of around $1.4 million, which would have resulted in a 16-level enhancement under § 2B1.1(b)(1).  *See* U.S.S.G. § 2B1.1(b)(1)(I–J) (2013).  Doc. 4-6 at 54–57.  The district court asked Martin what loss amount (with its corresponding enhancement) she was suggesting, and Martin responded that the loss amount was "definitely above $400,000," which is at the bottom end for a 14-level enhancement.  U.S.S.G. § 2B1.1(b)(1)(H–I) (2013).  Doc. 4-16 at 55–56.  After being given time to confirm her estimate, Martin stated that the loss amount was between $800,000 and $1,000,000, the latter figure being at the top of the range for a 14-level increase.  U.S.S.G. § 2B1.1(b)(1)(H) (2013).  Doc. 4-16 at 56.  After hearing testimony on the issue, the district court sustained Martin's objection to the Government's proposed loss-amount figure of $1.4 million and made a loss-amount finding of $1,000,000, yielding a 14-level § 2B1.1(b)(1) enhancement.  Doc. 4-16 at 60–105.  That loss amount, with its corresponding enhancement, applied to both Gadsden and his brother.

Notwithstanding Gadsden's allegation in his § 2255 motion, Attorney Keith did not agree with Attorney Martin at the sentencing hearing that the loss amount from the offense was between $800,000 and $1 million.  In objections to the presentence investigation report ("PSI"), Keith objected to the Government's proposed loss-amount figure and argued that the loss amount should be between $200,000 and $4000,000, for a 12-level enhancement, as was stipulated in the rejected plea agreement.  Doc. 8-1 at 32.  And at the sentencing hearing, Keith held the Government to its burden of proving the loss amount by a

preponderance of the evidence.  *See United States v. Rodriguez*, 751 F.3d 1244, 1255 (11th Cir. 2014).

Although the Sentencing Guidelines provide general principles for calculating loss amount, "the appropriate method for estimating loss in any given case is highly fact-dependent, and accordingly, district judges are entitled to considerable leeway in choosing how to go about this task."  *United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014).  The Eleventh Circuit has recognized that the Sentencing Guidelines do not require that the amount of loss be established with precision.  *United States v. Jordan*, 374 F. App'x 3, 7 (11th Cir. 2010) ("'[T]he guidelines contemplate that the court will simply make a reasonable estimate based on the available facts.'" (quoting U.S.S.G. § 2T1.1 cmt. n.1.)).

In his § 2255 motion, Gadsden objects to the methodology the district court used to determine that the loss amount was $1,000,000, arguing that the court's calculation was based on speculation where the Government failed to present sufficient reliable and specific evidence to establish loss.  Doc. 1-1 at 25–28.

The district court relied on the testimony of Secret Service Agent Leighton Greenlee, who used a multifactor analysis to trace bade checks to the conspiracy.  Agent Greenlee testified at the sentencing hearing that a bad check was included in the loss amount only if it satisfied specific criteria, such as being (1) from a local bank account opened with a minimum deposit;[8] (2) overnighted to the account holder; (3) written just after the account was opened; (4) mailed to an address linked to the coconspirators,

---

[8] Agent Greenlee testified that the conspiracy involved accounts opened at seven different banks. Doc. 4-16 at 76, 95.

including to Gadsden's residential address; (5) used at a frequently victimized store, such as Lowe's, Home Depot, or other building supply stores; (6) used for high-cost purchases, such as appliances and roofing shingles; or (7) used to buy the same item, from the same store, on the same day that a check from another suspect account was used to buy from the same store on the same day.  Doc. 4-16 at 61–75, 95–99.  Agent Greenlee testified that he confirmed the reliability of this analysis by interviewing 35 to 40 of the nearly 200 suspected members of the conspiracy and investigating their methods.  *Id*. at 64, 68–75, 94–96.  Agent Greenlee created a spreadsheet listing checks that fit the pattern of this multifactor analysis and excluded any checks that did not.  *Id*. at 61–67, 98.  He arrived at a total loss amount of $1,418,264.50.  *Id.* at 67.

After considering Agent Greenlee's testimony, the district court determined the loss amount to be $1 million, reducing the amount calculated by Agent Greenlee by nearly 30 percent—establishing a margin of error for any checks that Agent Greenlee may have mistakenly attributed to the conspiracy.  *Id.* at 104–05.

Gadsden pled guilty to the conspiracy charged in the indictment, a charge alleging that he and his codefendant brother organized and directed the activities involved in the conspiracy.  The district court could reasonably conclude that Agent Greenlee used a reasonable method to identify the nearly 200 individuals who passed worthless checks to identified businesses, that those individuals participated in the conspiracy organized and directed by Gadsden and his brother, and that the losses reported by the businesses were attributable to Gadsden.  Gadsden neither demonstrates that the loss attributed to him by the district court was improperly calculated nor identifies a plausible argument or evidence

that his trial counsel Keith should have presented that was reasonably likely to change the district court's loss determination.[9]   More particularly, Gadsden identifies no plausible argument supporting a loss determination of $400,000 or less.  Thus, he cannot show that Keith was ineffective for failing to argue successfully that the loss amount was $400,000 or less.

Because Gadsden does not show that Keith's performance was deficient or that he was prejudiced by any deficient performance, he is entitled to no relief on this claim of ineffective assistance of counsel.

### 4.      Number of Victims

Gadsden claims Keith was ineffective for failing to object to the number of victims attributed to him at sentencing.  *See* Doc. 1 at 4; Doc. 1-1 at 28–33; Doc. 18 at 1–2; Doc. 18-1.  However, Keith did object to the number of victims attributed to Gadsden, arguing that the offense involved only 10 or more (but fewer than 50) victims.  *See* Doc. No. 8-1 at 32; Doc. 4-16 at 50–52.  The objection was overruled by the district court, which found that Gadsden's offense involved 50 or more victims.  Doc. 4-16 at 52.  Thus, there is no factual basis for Gadsden's assertion that Keith failed to object to the number of victims attributed to him.

Moreover, Gadsden's suggestion that fewer victims should have been attributed to him is unsupported.   Section 2B1.1(b)(2) of the Sentencing Guidelines provides for a

---

[9] Gadsden argued on appeal that the district court's loss-amount calculation was not supported by sufficient evidence *(see* Doc. 4-18), an argument rejected by the Eleventh Circuit.  *See United States v. Gadsden*, 644 F. App'x 987, 988–89 (11th Cir. 2016); Doc. 4-19.

specific offense characteristic enhancement for certain economic fraud offenses based on the number of victims.  U.S.S.G. § 2B1.1(b)(2).  Application note 1 to U.S.S.G. § 2B1.1 defines "victim," in pertinent part, as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1)," and it defines a person as including "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies."  U.S.S.G. § 2B1.1, cmt. (n.1).  The PSI prepared by the Probation Office found there were 120 victims and recommended that a four-level § 2B1.1(b)(2) enhancement be applied to Gadsden.  *See* U.S.S.G. § 2B1.1(b)(2)(B) (providing for four-level enhancement where offense involved 50 or more victims).  Doc. 8-1 at 12, ¶ 23.  The district court accepted the recommendation in the PSI and imposed a four-level enhancement based on the finding that Gadsden's offense involved 50 or more victims.  *See* U.S.S.G. § 2B1.1(b)(2)(B).

The PSI contained a spreadsheet listing the 120 known victims of the bad-check scheme and the money amounts for the bad checks passed to each victim.  Doc. 8-1 at 8–11, ¶ 17.  Of the listed victims, 116 were retail-type businesses, while 4 were check-processing companies used by some businesses and responsible for covering the losses of those businesses that used them.  *See id.* at 8–11.  The money amounts for the bad checks passed to the 116 retail-type businesses on the spreadsheet were separate from the listed money amounts that the check-processing companies paid out to the businesses whose losses were covered by the check-processing companies.  *Id.*  At the sentencing hearing, the Government introduced exhibits further breaking down the victim spreadsheet in the PSI.  *See* Doc. 4-16.

16

Gadsden neither demonstrates that the district court's "50 or more victims" finding was erroneous nor identifies a plausible argument that Keith should have presented that was reasonably likely to change the district court's number-of-victims calculation.  As reflected in the PSI and established by the Government at sentencing, 120 known victims of the conspiracy sustained a financial loss.[10]   Gadsden claims the check-processing

_____

[10] On direct appeal, Gadsden argued that the district court improperly counted victims and losses from time during the conspiracy when he was incarcerated on other charges.  *See* Doc. 4-18; *United States v. Gadsden*, 644 F. App'x 987 (11th Cir. 2016).  The Eleventh Circuit rejected this claim, stating:

> "A conspirator's participation in a conspiracy is presumed to continue until all activity related to the conspiracy ceases."  *United States v. Odom,* 252 F.3d 1289, 1299 (11th Cir. 2001).  "Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law through every moment of [the conspiracy's] existence, and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot."  *Smith v. United States*, 568 U.S. [106, at 111], 133 S. Ct. 714, 719, 184 L. Ed. 2d 570 (2013) (alteration in original) (quotation and citations omitted).  A defendant may avoid such liability only by withdrawing from the conspiracy, which requires him to prove that he: (1) took affirmative acts inconsistent with the object of the conspiracy, and (2) either communicated those acts or his desire to withdraw to his co-conspirators, or disclosed the scheme to law enforcement.  *Odom*, 252 F.3d at 1299.  "Mere cessation of participation is not sufficient to establish withdrawal."  *United States v. Arias*, 431 F.3d 1327, 1341 (11th Cir. 2005).
>
> The district court did not clearly err by counting the losses and victims from portions of the conspiracy that occurred while Gadsden was incarcerated.  Gadsden presented no evidence showing that he withdrew from the conspiracy while incarcerated.  To the extent he argues that his imprisonment was tantamount to withdrawal, we have rejected this argument.  *See United States v. Gonzalez*, 940 F.2d 1413, 1427 (11th Cir.1991).  Thus, Gadsden's continued participation in the conspiracy was presumed.  *See Odom*, 252 F.3d at 1299.  Because his co-conspirators' perpetuation of the scheme was reasonably foreseeable, Gadsden remained responsible for the associated losses and victims.

*Gadsden*, 644 F. App'x at 989.  Gadsden reasserts his "incarceration argument" in his reply to the Government's response to his § 2255 motion.  *See* Doc. 15 at 26.  Still, however, he fails to prove that he withdrew from the conspiracy while incarcerated.  His continued participation in the

companies covered the losses of businesses victimized by the bad-check scheme. *See* Doc. 1-1 at 30–31; Doc. 18 at 1–2; Doc. 18-1.  However, other than in self-generated (and wholly self-serving) exhibits purporting to show that the victimized businesses had their losses covered, he presents no evidence that the 116 retail-type businesses that sustained losses from the bad checks passed to them were reimbursed, fully or partially, by the check-processing companies or any other third party.  As noted above, the money amounts for the bad checks passed to the 116 retail-type businesses on the spreadsheet in the PSI were separate from the money amounts that the check-processing companies paid out to the businesses whose losses were covered by the check-processing companies.  Further, the restitution amount ordered by the district court—$1 million—was based on the actual losses of the 120 victims reflected in the PSI and the Government's exhibits.  It is obvious from the restitution order that 50 or more businesses/victims had not been reimbursed when Gadsden was sentenced.[11]  Gadsden's reimbursement argument is meritless.

Because Gadsden does not show Keith's performance was deficient or that he was prejudiced by Keith's performance, he is entitled to no relief on this claim of ineffective assistance of counsel.

---

conspiracy while incarcerated is therefore presumed. *See United States v. Odom,* 252 F.3d 1289, 1299 (11th Cir. 2001).

[11] The Eleventh Circuit has recognized that for purposes of § 2B1.1(b)(2), victims may include persons who were not immediately reimbursed for their losses. *United States v. Lee*, 427 F.3d 881, 894–95 (11th Cir. 2005).

### 5.    *Thirty-Percent Reduction in Number of Victims*

Gadsden claims Keith was ineffective for failing to argue that the number of victims attributed to him should be reduced by the same percentage, 30 percent, by which the district court reduced the loss amount attributed to him.[12]  *See* Doc. 1 at 4; Doc. 1-1 at 34–36.

The loss enhancement under U.S.S.G. § 2B1.1(b)(1) and the victim enhancement under U.S.S.G. § 2B1.1(b)(2)(B) are two separate enhancements under the Sentencing Guidelines.  Gadsden points to no case law holding that the two enhancements are linked in the manner he argues for here.  Consequently, he does not show that Keith was ineffective for failing to argue that the number of victims attributed to him should be reduced by the same 30 percent by which the district court reduced the loss amount attributed to him.

Furthermore, the evidence showed—and the district court found—there were 120 victims attributable to Gadsden.  Section 2B1.1(b)(2)(B) provides for a four-level enhancement where the offense involves 50 or more victims. U.S.S.G. § 2B1.1(b)(2)(B).  A thirty-percent reduction of 120 victims equals 84 victims.  A finding by the district that 84 victims were attributable to Gadsden would still leave Gadsden subject to the same four-level enhancement in § 2B1.1(b)(2)(B).

---

[12] As noted above (*see* Part II.B.3), the district court found that the loss amount from the conspiracy was $1 million, reducing the loss amount found by Government witness Agent Leighton Greenlee by nearly 30 percent and establishing a margin of error for any checks Agent Greenlee may have mistakenly attributed to the conspiracy.  *See* Doc. 4-16 at 104–05.

Gadsden suffered no prejudice from Keith's failure to argue that the number of victims attributed to him should be reduced by 30 percent, and he is entitled to no relief on this claim.

### 6.    *Use of Proffer Statements at Sentencing*

Gadsden claims Keith was ineffective for failing to object to the Government's alleged use of his proffer statements for purposes of his sentencing. *See* Doc. 1 at 4; Doc. 1-1 at 36–39.

According to Gadsden, the Government would not have known about the sophisticated nature of the conspiracy, his role as a leader in the offense, or how many people were involved in the conspiracy if it had not relied on statements he made in a proffer to the Government on October 10, 2013. Doc. 1-1 at 36–39. However, as reflected in the criminal complaint filed on August 19, 2013 (Doc. 4-1), and the indictment filed on September 11, 2013 (Doc. 4-3), the Government knew about the sophisticated nature of the conspiracy and Gadsden's role in the offense before Gadsden's October 10, 2013 proffer. The criminal complaint was supported by Agent Greenlee's affidavit setting out the method he used to determine the nature of the conspiracy, its participants, Gadsden's role as a leader, the bank accounts used to defraud the victims, and the identity of the victims. Doc. 4-1 at 3–9. Agent Greenlee testified at length about these matters at the sentencing hearing, providing additional details gleaned from his investigation that Gadsden fails to show were derived from the October 10, 2013 proffer. Doc. 4-6 at 62–99.

Attorney Keith was not deficient for failing to object at sentencing to the Government's use of information the Government knew before Gadsden's October 10, 2013 proffer, or which the Government obtained independent of Gadsden's proffer. Because Gadsden has not shown such an objection would have been meritorious, he fails to demonstrate prejudice resulting from Keith's failure to object. Consequently, he is entitled to no relief on this claim of ineffective assistance of counsel.

### 7.   *Acceptance of Responsibility*

Gadsden claims Keith was ineffective for failing to argue he was entitled to a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), (b). Doc. 1 at 4; Doc. 1-1 at 39–40.

Notwithstanding Gadsden's claim, Keith did argue that Gadsden should receive a reduction for acceptance of responsibility. Before and during sentencing, Keith requested a downward variance and argued for the district court to grant Gadsden a reduction for acceptance of responsibility. *See* Doc. 4-16 at 8, 10, 109–112; Doc. 8-2 at 5. However, after considering evidence and argument that Gadsden had attempted to intimidate or influence a witness and was subject to a two-level enhancement under U.S.S.G. § 3C1.1 for obstructing justice, the district court applied the obstruction of justice enhancement (over Keith's objection) and denied Keith's request that Gadsden receive a reduction for acceptance of responsibility. *See* Doc. 4-16 at 28. Thus, there is no factual basis for Gadsden's assertion that Keith failed to argue he was entitled to a reduction for acceptance of responsibility.

"[U]nless it is an 'extraordinary' case, '[c]onduct resulting in an [obstruction of justice] enhancement . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.' *See* [U.S.S.G. § 3E1.1(a)], cmt. (n.4)." *United States v. McDonald*, 497 F. App'x 878, 881 (11th Cir. 2012); *see also, e.g., United States v. Amedeo*, 370 F.3d 1305, 1321 (11th Cir. 2004).  Even if Keith had failed to argue Gadsden was entitled to a reduction for acceptance of responsibility, Gadsden has not shown that his is an "extraordinary" case entitling him to such a reduction despite his having obstructed justice by attempting to intimidate or influence a witness.  Gadsden is entitled to no relief on this claim.

### 8.   *Calculation of Criminal History Points*

Gadsden claims Keith rendered ineffective assistance of counsel by failing to challenge the Probation Office's calculation of his criminal history points in the PSI.  *See* Doc. 1 at 4; Doc. 1-1 at 41–43.  Gadsden's claim notwithstanding, Keith objected in his September 15, 2014 sentencing memorandum to the Probation Office's calculation of Gadsden's criminal history points.  *See* Doc. 8-2 at 7.  Thus, Gadsden's claim is factually incorrect.

Gadsden specifically argues that the Probation Office improperly assessed (1) three criminal history points for his prior Montgomery County convictions for possession of a forged instrument and theft of property in Case No. CC-2008-1724, because, he says, the sentence for those convictions was imposed on the same day he was sentenced for a theft-of-property conviction in another Montgomery County case, Case No. CC-2008-895, that the Probation Office counted in his criminal history; (2) one criminal history point for a

22

Montgomery County charge for possession of an imitation controlled substance that did not result in a conviction; and (3) three criminal history points for his Autauga County youthful offender conviction for first-degree burglary in Case No. CC-1998-73, because, he says, a youthful offender conviction may not be counted in determining a defendant's criminal history and the sentence for that conviction was imposed more than ten years before he commenced his instant offense. *See* Doc. 1-1 at 41–43.

Contrary to his conclusory and unsupported assertions, Gadsden's sentence in Case No. CC-2008-1724 was imposed on a different date than his sentence in Case No. CC-2008-895, and the two different cases were unrelated. *See* Doc. 8-1 at 14–15, ¶¶ 36–37. Therefore, Gadsden was properly assessed three points for the sentence imposed in Case No. CC-2008-1724 and another three points for the sentence imposed in Case No. CC-2008-895. *See* U.S.S.G. § 4A1.1(a).

Also contrary to Gadsden's assertions, Gadsden received no criminal history points for his Montgomery County charge for possession of an imitation controlled substance. *See* Doc. 8-1 at 19, ¶ 56. His allegation in this regard is without merit.

Finally, the Probation Office assessed Gadsden with *one* criminal history point, not three points as alleged by Gadsden, for his Autauga County youthful offender conviction. The Eleventh Circuit has held that if a defendant was convicted in an adult state court and received an adult sentence, the adjudication counts as a sentence of imprisonment for purposes of the defendant's criminal history score, even if the defendant was classified by the state as a youthful offender. *United States v. Pinion*, 4 F.3d 941, 945 (11th Cir. 1993). Gadsden was convicted of burglary (an offense committed when he was 17) in an adult

state court, and in April 2005 he received a sentence of three years' imprisonment, although Alabama classified him as a youthful offender. *See* Doc. 8-1 at 13, ¶ 34. Under U.S.S.G. § 4A1.1(c), that conviction counted as a sentence of imprisonment for which Gadsden could be assessed one criminal history point. Further, under U.S.S.G. § 4A1.2(e)(2), the sentence for that conviction was imposed within ten years of Gadsden's commencement of his instant offense. Thus, the Probation Office properly assessed one criminal history point for Gadsden' youthful offender conviction.

Even if Gadsden's youthful offender conviction should not have been counted as a sentence of imprisonment for which he could be assessed one criminal history point, it makes no difference for purposes of Gadsden's present claim. In the PSI, the Probation Office assessed one criminal history point for Gadsden's youthful offender conviction under U.S.S.G. § 4A1.1(c). Doc. 8-1 at 13, ¶ 34. In addition, the Probation Office assessed Gadsden a total of five criminal history points under U.S.S.G. § 4A1.1(c) for five other prior convictions, none of which involved youthful offender adjudications. *See* Doc. 8-1 at 14–17, ¶¶ 38, 40, 41, 43, 45. A maximum of four criminal history points may be counted under § 4A1.1(c);[13] therefore, in its final total in the PSI, the Probation Office assessed Gadsden only four criminal history points for the six prior convictions (including the youthful offender conviction) that were assessed one point each in its subtotal. Doc. 8-1 at 17, ¶ 46. Even if Gadsden's youthful offender conviction is "thrown out" from a calculation of his criminal history points, he has five remaining (and unchallenged)

---

[13] Section 4A1.1(c) provides: "Add 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this subsection." U.S.S.G. § 4A1.1(c).

convictions that may be assessed one criminal history point under § 4A1.1(c), sufficient to meet the four-point maximum of § 4A1.1(c). In other words, even if Gadsden's youthful offender conviction is not assessed one criminal history point and is not considered at all in the calculation of his criminal history, Gadsden's total criminal history score of 15 would be unaffected. According to the sentencing table in U.S.S.G. Chapter 5, Part A, a criminal history score of 15 establishes a criminal history category of VI. Gadsden's criminal history category would also have been VI with no consideration of his youthful offender conviction. Thus, he was not prejudiced by the Probation Office's assessment of one criminal history point for that conviction in the PSI.

Gadsden demonstrates no error in the calculation of his criminal history points. And even if his youthful offender conviction should not have been considered in that calculation, his total criminal history score and his criminal history category were unaffected by its inclusion in the Probation Office's calculation in the PSI. Therefore, Gadsden can demonstrate no prejudice arising from Keith's failure to specifically object to the one-point assessment for the youthful offender conviction. Gadsden is entitled to no relief on this claim of ineffective assistance of counsel.

## C.   Remaining Claims

### 1.   Enhancement for Obstruction of Justice

Gadsden claims the district court erred by imposing a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Doc. 1 at 5; Doc. 1-1 at 44–47. As noted above in this Recommendation (Part II.B.7), evidence was presented at the sentencing hearing that Gadsden had attempted to intimidate or influence a witness and was therefore

subject to a two-level enhancement under § 3C1.1 for obstructing justice.  After hearing the evidence and arguments by the parties, the district court found that the obstruction-of-justice enhancement should apply to Gadsden.  *See* Doc. 4-16 at 28.  Gadsden's claim in his § 2255 motion that the district court erred in this regard is procedurally defaulted because Gadsden did not raise this issue on direct appeal.

Ordinarily, where a claim is not advanced on direct appeal, it is deemed procedurally barred in a § 2255 proceeding.  *See McKay v. United States*, 657 F.3d 1190, 1196 (11th Cir. 2011); *Reece v. United States*, 119 F.3d 1462, 1467 n.9 (11th Cir. 1997); *Mills v. United States*, 36 F.3d 1052, 1055–56 (11th Cir. 1994).  A petitioner can avoid this procedural bar by showing both cause for failing to raise the claim on direct appeal and actual prejudice arising from that failure.[14]  *See United States v. Frady*, 456 U.S. 152, 167–68 (1982); *Mills*, 36 F.3d at 1055.

Gadsden avers there is cause for his default: the ineffective assistance of his appellate counsel for failing to raise this claim on appeal.  Doc. 15 at 47–48.  While ineffective assistance of counsel may establish cause excusing procedural default, "the claim of ineffective assistance must have merit."  *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000).  To determine whether the ineffective-assistance claim has merit,

---

[14] To satisfy the "cause" exception to a procedural default, a petitioner "must show that some objective factor external to the defense prevented [petitioner] or his counsel from raising his claim on direct appeal and that this factor cannot be fairly attributable to [petitioner's] own conduct." *Lynn v. United States*, 365 F.3d 1225, 1235 (11th Cir. 2004). To establish that the cause of the procedural bar actually caused prejudice, a petitioner must show, "not merely that the error[ ] [claimed] created a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Unites States v. Frady*, 456 U.S. 152, 170 (1982).

the court must decide whether counsel's failure to assert the underlying substantive claim could have affected the outcome of the appeal. *Id.* Appellate counsel is not ineffective for failing to raise a meritless claim. *Id.*

At the sentencing hearing, the Government presented evidence that in August 2013, while being held with Gadsden in the Lee County Jail, Martavious Thomas, who was a potential witness regarding the bad-check scheme (for which, like Gadsden, he had been arrested), wrote a note that tended to absolve Gadsden of participation in the scheme. Doc. 4-16 at 13–22. Thomas gave the note to a jail staff member. At the start of the note, however, Thomas had written, "Derrick Gadsden had me write this for him which I did out of fear of him." *See* Doc. 8-1 at 11, ¶ 19. The jail staff member turned the note over to a detective with the Opelika Police Department who was investigating the case, who then turned the note over to Secret Service Agent Leighton Greenlee, who was also investigating the case. Doc. 4-16 at 15–17. At the sentencing hearing, Greenlee testified that after he received the note from the detective, federal investigators requested and received recorded jail phone calls made by Gadsden and his brother. *Id.* at 17. Greenlee testified that in repeated phone calls, Gadsden referred to having Martavious Thomas write a letter that would clear Gadsden of the charges. *Id.*

Gadsden testified at the sentencing hearing and maintained Thomas wrote the note absolving him "on his own free will." *Id.* at 24. He denied having threatened or intimated Thomas to get him to write the note. *Id.* at 24–25.

The Government must establish by a preponderance of evidence the facts necessary to support a sentencing enhancement. *See United States v. Lucas*, 193 F. App'x 844, 846–

27

47 (11th Cir. 2006). The district court found that, by a preponderance of the evidence, the Government had proved that Gadsden obstructed justice or attempted to obstruct justice in his dealings with Thomas. Doc. 14-6 at 28.

Section 3C1.1 of the Sentencing Guidelines provides for a two-level enhancement for defendants who "willfully obstruct[ ] or impede[ ], or attempt[ ] to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction...." *Id.* "[T]hreatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" is an example of conduct that constitutes obstruction of justice for purposes of the § 3C1.1 enhancement. U.S.S.G. § 3C1.1 cmt. (n.4).

Here, the Government presented ample evidence to support the district court's imposition of the enhancement for obstruction of justice in Gadsden's case. Gadsden fails to show he would have prevailed on this issue if his counsel had pursued it on appeal. Therefore, he does not demonstrate cause excusing his procedural default of this claim.

### 2.    *Restitution Calculation*

Gadsden claims the district court erred in its calculation of the restitution for which he was responsible. Doc. 1 at 7; Doc. 1-1 at 48–50; Doc. 19. He maintains that the restitution amount was based on speculative evidence and that his case should be remanded for an evidentiary hearing to establish accurate restitution amounts. Doc. 1-1 at 48–49.

The district court's order of restitution rendered Gadsden jointly and severally liable with his brother David to pay restitution in the amount of $1 million, to be allocated to the victims of the offense. *See* Doc. No. 4-16 at 121–22; Doc. 4-17 at 6–31.

28

A § 2255 motion may not be utilized by a person in federal custody to attack the restitution portion of his sentence. *See Mamone v. United States*, 559 F.3d 1209, 1211 (11th Cir. 2009). In *Mamone*, the Eleventh Circuit held that § 2255 is an inappropriate vehicle for challenging the restitution part of a sentence, whether or not the claim is coupled with one seeking release from custody. *Id.* at 1210–11. The Court reasoned:

> Our holding in *Blaik [v. United States*, 161 F.3d 1341 (11th Cir. 1998], . . . supports our conclusion that *Mamone* cannot utilize § 2255 to challenge his restitution. *See Blaik*, 161 F.3d at 1343 (holding that "§ 2255 cannot be utilized by a federal prisoner who challenges only the restitution portion of his sentence"). In *Blaik*, we also noted that granting a restitution reduction in a § 2255 motion would be taking an action clearly not authorized by the statute's language. *Id.* at 1342; 28 U.S.C. § 2255(a). This same reasoning applies here. The plain language of the statute indicates § 2255 applies to "a prisoner in custody . . . claiming the right to be released." 28 U.S.C. § 2255. As the Ninth Circuit determined in [*United States v.] Thiele*, [314 F.3d 399 (9th Cir. 2002),] "[n]on-cognizable claims do not morph into cognizable ones by osmosis." 314 F.3d at 402. We agree, and conclude the presence of a cognizable claim against Mamone's custodial punishment does not make his non-cognizable claims more amenable to our review.

559 F.3d at 1211.

Because relief from restitution is a remedy not authorized by § 2255, this court may not grant Gadsden relief on his claim that the district court erred in its calculation of restitution.

Even if a § 2255 motion could be utilized by a federal prisoner to challenge the restitution portion of his sentence, Gadsden does not establish a meritorious claim for relief. The district court's restitution award was based on the actual financial loss incurred by the victims of the conspiracy. In the PSI and at the sentencing hearing, the Government presented evidence of 120 known victims who sustained a financial loss from the bad-

check scheme, including the money amounts for the bad checks passed to each victim.  At the time of sentencing, no victims had been reimbursed for their losses.  Gadsden does not demonstrate that the loss amount determined by the district court was improperly calculated or based on speculation, and he fails to identify a plausible argument or evidence that his counsel (at sentencing or on appeal) should have presented that was reasonably likely to change the district court's restitution award.[15]   The restitution award was supported by "reliable and specific evidence."  *See United States v. Stein*, 846 F.3d 1135, 1156 (11th Cir. 2017).

Furthermore, on direct appeal, the Eleventh Circuit held that the Government's evidence was sufficient to support the district court's determination of a loss amount from the offense of $1 million.  *See United States v. Gadsden*, 644 F. App'x 987, 988–89 (11th Cir. 2016).  In Gadsden's case, this loss amount was actual loss, not the loss intended from the offense.  As noted above, the district court's restitution award was based entirely on the actual financial loss incurred by the victims of the conspiracy.[16]  Gadsden demonstrates no error in the district court's calculation of restitution, and he is entitled to no relief based on this claim.

---

[15] Gadsden suggests that his counsel, Keith, was ineffective for failing to challenge the district court's restitution calculation.  *See* Doc. 1-1 at 48–49.  Even if this attempt to backdoor his claim challenging the court's restitution order is cognizable in a § 2255 motion, it would not entitle Gadsden to any relief, because he fails to demonstrate error in the court's restitution calculation.

[16] Restitution is limited to actual loss which a defendant is then responsible for paying back.  *See United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001) ("An award of restitution must be based on the amount of loss actually caused by the defendant's conduct.").

### 3. *"Lack of Jurisdiction"*

Gadsden argues that his conviction should be vacated for lack of jurisdiction because, he says, some of the checks in the case were processed "hand-to-hand" and were not processed electronically or transmitted through interstate wire which he says is a requirement for federal jurisdiction. Doc. 1 at 8; Doc. 1-1 at 51–56; Doc. 15 at 27; Doc. 18 at 1.

Gadsden did not present this claim to the district court or on direct appeal. Therefore, it is procedurally defaulted. *McKay*, 657 F.3d at 1196. However, Gadsden asserts the ineffective assistance of his trial and appellate counsel as cause excusing his procedural default. *See* Doc. 1-1 at 52. Gadsden fails to demonstrate that his claim is meritorious.

> Wire fraud occurs when someone devises or intends to devise
>
> any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice[.]

18 U.S.C. § 1343. Gadsden pled guilty to conspiracy to commit wire fraud. The conspiracy involved a scheme that used interstate wire communication. As stated in the indictment, and contrary to Gadsden's assertions, the scheme involved checks being processed electronically in different states which means interstate wire communication was used. Doc. 4-3 at 3–5. As charged in the indictment, the bad-check scheme succeeded because, once the members of the conspiracy handed the checks to the merchant:

g.   The checks used to make the purchases were processed for payment by a check guarantee service, such as TeleCheck or Certegy.  The checks were processed electronically and transmitted by wire through interstate commerce.

h.   Once the checks were initially approved in order to clear the sale of the items, DAVID GADSDEN, DERRICK GADSDEN, and others were able to leave the businesses with their purchases.

Doc 4-3 at 4.

Furthermore, in an exchange with counsel Keith at the change of plea hearing,

Gadsden admitted to the following under oath:

MR. KEITH: These checks that you presented that you and your brother were involved in presenting to various businesses were processed for payment by a company called TeleCheck or Certegy.  It's kind of a check guarantee service.

[GADSDEN:] Yes, sir.

MR. KEITH: And the checks were processed electronically and transmitted, as far as you know now, by wire through interstate commerce.

[GADSDEN:] Yes, sir.

MR. KEITH: Specifically, the TeleCheck processing centers  were located in Chandler, Arizona, or Omaha, Nebraska, outside of Alabama.

[GADSDEN:] Yes, sir.

MR. KEITH: And that was for TeleCheck.  Certegy process check scanners were apparently located in St. Petersburgh, Florida, or Chicago, Illinois.

[GADSDEN:] Yes, sir.

MR. KEITH: And you know now that's why it's all interstate commerce; is that right?

[GADSDEN:]  Yes, sir.

Doc. 4-7 at 16–17.  Gadsden admitted that using interstate wire communications was part of the conspiracy.  That admission invalidates his present claim.

Gadsden's claim that some of the checks in the case were processed "hand-to-hand" is unsupported by any evidence and is little more than a conclusory assertion.  As he does with respect to other claims, he presents only self-generated and wholly self-serving exhibits purporting to show that some of the checks in the case were processed "hand-to-hand."  *See* Doc. 15 at 27; Doc. 15-13; Doc. 15-14.

Finally, Gadsden's claim does not negate the fact that interstate wire communication was used as part of the conspiracy.  Because he fails to show that his claim is meritorious, he fails to show that his counsel rendered ineffective assistance by failing to raise it and likewise fails to demonstrate cause excusing his procedural default of this claim.

### III.   CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that the 28 U.S.C. § 2255 motion filed by Gadsden be DENIED and this case DISMISSED with prejudice.

It is further

ORDERED that the parties shall file any objections to this Recommendation on or before **February 14, 2020**.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations under 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the District Court of legal and factual issues covered

in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1.  *See Stein v. Lanning Securities, Inc*., 667 F.2d 33 (11th Cir. 1982*).  See also Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 31st day of January, 2020.

 /s/ Jerusha T. Adams.
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE